***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Harris and the briefs and arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence or rehear the parties or their representatives. The Full Commission AFFIRMS with some modifications the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS 1. Both plaintiff and defendant are subject to the Act. *Page 2 
2. Defendant-employer is self-insured, with Key Risk Management Services, Inc. as the third-party administrator.
3. Plaintiff was the employee of defendant-employer on April 15, 1999.
4. Plaintiff sustained a compensable injury by accident on or about April 15, 1999 while working for defendant-employer, when she injured her low back.
5. Defendant accepted this low back claim on a Form 60 dated May 22, 2000.
6. Plaintiff's average weekly wage for the purposes of this action is $542.30, and her compensation rate is $361.55.
7. Defendant has not paid the entire waiting period.
8. The following documents were accepted into evidence as stipulated exhibits:
 a. Exhibit 1: Executed Pre-Trial Agreement
 b. Exhibit 2: Industrial Commission Forms
9. The following documents were received into evidence as plaintiff's exhibits:
 a. Exhibit 1: Plaintiff's medical records (including records from Burke Primary Care, concerning treatment for plaintiff's back, submitted following the Deputy Commissioner's in camera review)
 b. Exhibit 2: Incident investigation report dated April 15, 1999
 c. Exhibit 3: Job description for Health Care Technician dated February 1997
 d. Exhibit 4: "Restricted Work Schedule"
 e. Exhibit 5: Letter to plaintiff from Joyce Jensen dated November 22, 1999
 f. Exhibit 6: Job description for HCT-Trainer I dated February 21, 2000
 g. Exhibit 7: Memo regarding plaintiff's restricted duties dated April 3, 2000 *Page 3 
 h. Exhibit 8: Defendant's responses to plaintiff's discovery requests
 i. Exhibit
9: Excerpts from State Personnel Manual regarding Workers' Compensation administration
10. The following documents were received into evidence as defendant's exhibits, all over plaintiff's objection:
 a. Exhibit 1: "Work against" documentation
 b. Exhibit 2: Letter from plaintiff's counsel to Susan Bowman and Nancy Hunter dated October 31, 2000
 c. Exhibit 3: Documentation concerning plaintiff's retirement
 d. Exhibit 4: Job description for Health Care Technician I dated October 16, 1989
 e. Exhibit 5: Work plan dated November 26, 2002
 f. Exhibit 6: Plaintiff's responses to defendant's discovery requests
 g. Exhibit
7: Defendant's responses to plaintiff's discovery requests
11. Transcripts of depositions of Dr. Stephen K. Smith (with plaintiff's Exhibits 1 and 2; plaintiff's Exhibit 2 was received into evidence over defendant's objection) and Dr. Leon A. Dickerson (with Plaintiff's Exhibit 1) are part of the evidence of record.
12. The issues before the Commission are whether plaintiff is currently disabled and/or has been at any time since her employment with defendant-employer ended and to what compensation, if any, is plaintiff entitled.
 ***********
Based upon all of the competent credible evidence of record, the Full Commission makes the following: *Page 4 
 FINDINGS OF FACT
1. As of the hearing before the Deputy Commissioner, plaintiff was 65 years of age. She dropped out of school in the ninth grade, but earned her GED in 1977 in order to go to work with the State of North Carolina.
2. Prior to starting work with defendant-employer, plaintiff worked in factories beginning in 1963 in light assembly and sewing jobs.
3. Plaintiff worked for defendant-employer at its Western Carolina Center (WCC) in Morganton, North Carolina from 1977 until she retired on December 31, 2002. Plaintiff spent her entire career there in a health care technician (HCT) position.
4. Defendant-employer operates an intermediate care facility for 333 developmentally disabled residents. The facility has 15 cottages and the residents live in three areas: a non-ambulatory area, an area for those who are behavioral challenges, and an area with both non-ambulatory and ambulatory residents. Defendant-employer has a staff of 1,000, 354 of whom are HCTs.
5. Plaintiff sustained a compensable low back injury on April 15, 1999 when, in the course of her job duties, she felt a sharp pain in her low back while trying to pull a wheelchair out of a closet.
6. Plaintiff initially did not miss any time from work. By the fall of 1999, plaintiff's back pain caused her to miss some days of work. However, there is insufficient evidence in the record from which the Commission can make findings concerning the dates plaintiff missed work due to her compensable injury.
7. Defendant-employer placed plaintiff on light duty work on November 30, 1999. Thereafter, through the date of her retirement, plaintiff worked on a succession of 14 different *Page 5 
"work against" assignments of various durations. The "work against" assignments meant that plaintiff was given job duties tailored to her restrictions and was paid her full pre-injury salary with funds drawn against vacant positions, the salaries for which defendant-employer had already budgeted. Except for initially missing some short periods of time for which she was paid temporary total disability compensation, plaintiff was able to do the light duty jobs.
8. On December 14, 1999, plaintiff had an MRI of her low back, which showed a moderate-sized disc herniation at L4-5 on the left, compressing the nerve root.
9. Plaintiff first saw Dr. Leon A. Dickerson, an orthopedic surgeon, on December 15, 1999. She complained of low back pain and left leg pain following her April 15, 1999 injury. Dr. Dickerson recommended a course of three epidural steroid injections, which plaintiff underwent. On December 28, 1999, Dr. Dickerson assigned a two-pound lifting restriction.
10. On February 22, 2000, plaintiff reported that the injections had helped her symptoms, although she still had some pain in her left leg. Dr. Dickerson did not feel that surgery was indicated. Plaintiff was tolerating the light duty work with defendant-employer and, as stated by Dr. Dickerson, "did not want to go any further with this at all." Dr. Dickerson increased plaintiff's lifting limit to 10 pounds.
11. On March 21, 2000, Dr. Dickerson found plaintiff to have reached maximum medical improvement with a permanent partial impairment rating of five percent to the back. Dr. Dickerson assigned a 10-pound lifting restriction to be in effect for "several months."
12. Plaintiff did not return to Dr. Dickerson until October 3, 2000, when she reported that she was still working with defendant-employer within her restrictions and doing pretty well. Dr. Dickerson assigned permanent restrictions of no lifting greater than 15 pounds and no *Page 6 
prolonged bending, stooping, squatting or kneeling, and he believed that plaintiff could continue with her work with defendant-employer.
13. Plaintiff continued working with defendant-employer in her modified HCT position and did not see Dr. Dickerson for over two years. She did have a flare-up of back pain in June of 2002 during and following a long car ride, but she continued working.
14. On December 16, 2002, plaintiff presented to her family physician, Dr. Stephen K. Smith, for evaluation of her unrelated trigeminal neuralgia condition, which causes excruciating pain in her face. At this appointment, plaintiff complained of continued low back pain and left leg pain. Dr. Smith ordered an MRI, which showed that the herniation at L4-5 had increased in size.
15. As of December 31, 2002, at 60 years of age, plaintiff retired from State government with 25 years of service. She has drawn retirement since then and has not looked for any work. No physician has written plaintiff out of work since she retired.
16. On January 22, 2003, plaintiff returned to Dr. Dickerson with low back pain and left leg pain. However, plaintiff stated that her symptoms had improved since she had made the appointment one or two weeks earlier. As such, plaintiff did not want to pursue any treatment other than continuance of her medications.
17. Plaintiff returned to Dr. Dickerson with periodic flare-ups of her low back pain in March of 2004, April of 2005 and March of 2006.
18. On November 28, 2006, plaintiff returned to Dr. Dickerson following a flare-up. Dr. Dickerson recommended a nerve root block on the left side at L-5. Plaintiff underwent three such blocks in January, February and March of 2007, which plaintiff said helped her a great deal. Also, an MRI on January 29, 2007 showed no change in her back condition from the 2002 MRI. *Page 7 
19. Plaintiff next saw Dr. Dickerson on September 11, 2007, stating that her back pain had returned very sharply but had gradually improved. Plaintiff did not want to pursue any different treatment options, and Dr. Dickerson's treatment recommendation stayed the same: medications, nerve root blocks as needed, and an exercise program.
20. Neither Dr. Smith nor Dr. Dickerson provided any updated restrictions for plaintiff at their depositions taken in early October of 2007. Dr. Dickerson believed that plaintiff could have continued to work in her job with defendant-employer with the 15-pound lifting restriction. Dr. Dickerson did not change plaintiff's permanent partial disability rating.
21. Plaintiff still takes an anti-inflammatory two times a day and regularly takes the pain medication Tramadol and the muscle relaxer Skelaxin.
22. The "work against" arrangement utilized in this case from November of 1999 through plaintiff's retirement in December of 2002 was consistent with the policy dictated in the State Personnel Manual's Worker's Compensation Administration "Return to Work" provisions. With regard to an employee who has not reached maximum medical improvement but is released to limited duty, "the agency shall provide work reassignment suitable to the employee's capacity which is both meaningful and productive, and advantageous to the employee and the agency." The assignment is to be temporary, not exceeding 90 days unless approved by the agency personnel officer to exceed that period. With regard to an employee who has reached maximum medical improvement but retains some restrictions such that she cannot work in her pre-injury position, "the agency shall attempt to place the employee in another position suitable to the employee's capacity which is both meaningful and productive, and advantageous to the employee and the agency." The assignment may then be either permanent or temporary. See *Page 8 
State Personnel Manual, 10/21/99, Section 6, Pages 9-10. Work-against assignments can be used indefinitely for a permanent full-time positional employee.
23. The various duties that plaintiff had during the three years before her retirement were "meaningful and productive" within the context of the State personnel policy. The clients at WCC have moderate to profound mental retardation, and the job of the HCT, just as much or more so than the physical requirements of the job, is to be a companion for the residents in order to try to give them meaningful life experience. Although plaintiff could not do some of the physical duties she had done pre-injury, she was able to provide helpful social interaction with the residents, such as reading, games and active play, built on over 20 years of experience in this environment.
24. The cottages at WCC are divided by the differing functional levels of their residents, and each cottage thus has different requirements for the HCTs who work there, depending upon the needs of the residents. It is common for HCTs to be re-assigned among cottages, taking on different duties depending upon the needs of their assigned cottages. The duties that plaintiff covered in over three years of light duty after her injury were necessary to the functioning of WCC and would have had to have been covered by other HCTs had plaintiff not been doing them. The general job description for an HCT includes all possible tasks that an HCT may do, but the tasks an HCT performs depend on the particular cottage where the HCT works, the needs of the residents in that cottage, and time of the shift worked.
25. Defendant-employer's human resources manager, Nancy Hunter, approved the ongoing "work against" arrangement that plaintiff worked, and defendant-employer's actions were consistent with its personnel policies. Until her retirement plaintiff continued to be a permanent full-time employee with the same benefits as any HCT. *Page 9 
26. The Full Commission finds that the HCT job plaintiff worked from 1999 until her retirement on December 31, 2002 was suitable employment. After her retirement, plaintiff failed to prove by the greater weight of the evidence that she was disabled from any employment. Dr. Dickerson stated that plaintiff could have continued working as an HCT after 2002. Plaintiff was capable of some work, did not make a reasonable job search, and did not show that it would have been futile for her to seek employment.
27. Further medical treatment of plaintiff's compensable low back condition is reasonably required to effect a cure and/or provide relief for said condition.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On April 15, 1999 plaintiff sustained an admittedly compensable injury by accident arising out of and in the course of plaintiff's employment with defendant-employer. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff's employment as an HCT from November 1999 through December 31, 2002 was not make work and constituted suitable employment and therefore the wages she earned in this employment established post-injury wage earning capacity. The employment was not so modified because of plaintiff's limitations that it would not have been ordinarily available in the competitive job market. Peoples v. Cone Mills Corp., 316 N.C. 426,342 S.E.2d 798 (1986).
3. Defendant admitted the compensability of plaintiff's injury by accident on April 15, 1999 by filing a Form 60. However, the Form 60 does not create a presumption of *Page 10 
continuing disability and therefore the burden of proving disability remains with plaintiff. Sims v. Charmes/Arby's Roast Beef,142 N.C. App. 154, 542 S.E.2d 277 (2001).
4. In order to meet the burden of proving disability, plaintiff must prove that she was incapable of earning pre-injury wages in either the same or in any other employment and that the incapacity to earn pre-injury wages was caused by plaintiff's injury. Hilliard v. ApexCabinet Co., 305 N.C. 593, 290 S.E.2d 682 (1982). An employee may meet the initial burden of production by producing one of the following: (1) medical evidence that she is physically or mentally, as a result of the work-related injury, incapable of work in any employment; (2) evidence that she is capable of some work, but that she has, after a reasonable effort, been unsuccessful in her efforts to obtain employment; (3) evidence that she is capable of some work, but that it would be futile because of preexisting conditions, such as age, inexperience, or lack of education, to seek employment; or (4) evidence that she has obtained other employment at wages less than his pre-injury wages. Demery v.Perdue Farms, Inc., 143 N.C. App. 259, 545 S.E.2d 485 (2001); Russellv. Lowes Product Distribution, 108 N.C. App. 762, 425 S.E.2d 454 (1993) (citations omitted). When a plaintiff meets her burden of showing disability, the burden then shifts to defendants to produce evidence that suitable jobs are available for the employee and that the employee is capable of obtaining a suitable job, taking into account both physical and vocational limitations. Demery v. Perdue Farms., Inc., supra.
5. In this case plaintiff worked three years for defendant-employer in a permanent full-time position and established post-injury wage earning capacity. After she voluntarily retired in 2002, plaintiff failed to show continuing disability. Demery v. Perdue Farms., Inc., supra. Plaintiff was capable of some work, made no effort to obtain employment, and has not *Page 11 
shown that it would have been futile for her to seek employment because of other factors. No physician took plaintiff out of work after 2002.
6. Plaintiff is entitled to payment by defendant of all medical expenses incurred or to be incurred as a result of her compensable injury, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, give relief or tend to lessen plaintiff's period of disability. N.C. Gen. Stat. §§ 97-2(19) and 97-25.
7. As the result of her compensable injury, plaintiff sustained a five percent permanent functional impairment to her back and is entitled to payment by defendant of permanent partial disability compensation for 15 weeks at the rate of $361.55 per week. N.C. Gen. Stat. § 97-31(23).
8. Plaintiff is also entitled to payment of temporary total disability compensation for the entire waiting period, which defendant has not disputed, along with a ten percent penalty on the unpaid amount pursuant to N.C. Gen. Stat. § 97-18(g).
 ***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant shall continue to provide plaintiff with medical treatment for her compensable low back condition, including, but not limited to, surgery, physical therapy, prescriptions, mileage and referrals.
2. Defendant shall pay plaintiff permanent partial disability compensation for the permanent functional impairment to her back for 15 weeks at the rate of $361.55 per week. This *Page 12 
amount has accrued and shall be paid in a lump sum, subject to the attorney's fee awarded below.
3. If not done already, defendant shall also pay plaintiff compensation for whatever remains due for the waiting period, plus a 10 percent penalty on the outstanding amount, subject to the attorney's fee awarded below.
4. A reasonable attorney's fee of 25% of the compensation awarded plaintiff in paragraphs 2 and 3 above is approved for plaintiff's counsel and shall be paid directly to plaintiff's counsel.
5. Defendant shall pay the costs. As part of the costs, if not done already, defendant shall pay an expert witness fee of $340.00 to Dr. Smith and $637.50 to Dr. Dickerson.
This the 4th day of August, 2008.
 S/___________________
 LAURA KRANIFELD MAVRETIC
 COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/___________________ DIANNE C. SELLERS COMMISSIONER